165
2/6/02

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOHN RICHARD JAE,                :        CIVIL NO. 1:CV-00-0315
                                 :
              Plaintiff          :        (Judge Rambo)
                                 :
      v.                         :        (Magistrate Judge Smyser)
                                 :
                                 :        FILED
                                 :        HARRISBURG, PA
KENNETH K. KYLER, et al.,        :
                                 :        FEB 0 6 2002
              Defendants         :
                                          MARY E. D'ANDREA, CLERK
                                          Per_____
                                              Deputy Clerk

                    **REPORT AND RECOMMENDATION**

        This is a prisoner civil rights matter pursuant to 42

U.S.C. § 1983 that was originally initiated by the plaintiff's

filing of a complaint with the Court of Common Pleas of

Cumberland County on January 24, 2000. (Doc. 1).  On February

22, 2000, the matter was removed to this court. (Doc. 1).  On

July 17, 2000, the plaintiff filed a supplemental complaint.

(Doc. 22).  The defendants filed a motion for summary judgment

on October 17, 2000.  (Doc. 53). The motion has been fully

briefed by the parties and is ripe for disposition.[1]   For the

_____

        [1]Subsequent to the filing of the defendants' motion for
summary judgment, several matters arose in this case including
numerous discovery disputes and the filing of a motion by the
                                            (continued...)

reasons that follow, it will be recommended that complaint in part be dismissed and that in part summary judgment be granted.

## I.    Summary Judgment Standard.

A motion for summary judgment may not be granted unless the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. The court may grant a motion for summary judgment if the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits show that there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(c).  An issue of fact is "`genuine' only if a reasonable jury, considering the evidence presented, could find for the nonmoving party." *Childers v. Joseph*, 842 F.2d 689, 693-694 (3d Cir. 1988) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

---

(...continued)
plaintiff to remand the matter to state court.  These matters having been resolved, the plaintiff filed his brief in opposition to the summary judgment motion on November 5, 2001, after having been granted several extensions of time in which to do so.

AO 72A
(Rev.8/82)

The burden of proving that there is no genuine issue of material fact is initially upon the movant. *Forms, Inc. v. American Standard, Inc.*, 546 F. Supp. 314, 320 (E.D. Pa. 1982), *aff'd mem.* 725 F.2d 667 (3d Cir. 1983). Upon such a showing, the burden shifts to the nonmoving party. *Id.* The nonmoving party is required to go beyond the pleadings and by affidavits or by "depositions, answers to interrogatories and admissions on file" designate "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In determining whether an issue of material fact exists, the court must consider the evidence in the light most favorable to the nonmoving party. *White v. Westinghouse Electric Company*, 862 F.2d 56, 59 (3d Cir. 1988). In doing so,

3

the court must accept the nonmovant's allegations as true and
resolve any conflicts in his favor.  *Id., quoting Gans v.
Mundy*, 762 F.2d 338, 340 (3d Cir. 1985), *cert. denied,* 474 U.S.
1010 (1985); *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573
(3d Cir. 1976) *cert. denied*, 429 U.S. 1038 (1977).

## II. Factual Background

The plaintiff is a Pennsylvania state prisoner currently
confined at the State Correctional Institution at Pittsburgh.
(Doc. 164).  The incidents which gave rise to his instant
complaint occurred while he was confined in the Restrictive
Housing Unit (RHU) at the State Correctional Institution at
Camp Hill (SCI Camp Hill).  The plaintiff claims in his
original and supplemental complaints that while confined in the
RHU he was denied access to his "personal law books" and
religious material.  He also complains of various conditions to
which he was subjected in the RHU.  Specifically, the plaintiff
alleges that he was denied showers and outside exercise and
that a plexiglass shield was placed over his cell door which

4

caused his cell to become excessively hot and poorly
ventilated.

## III. Analysis

The defendants assert that they are entitled to summary
judgment because, *inter alia*, the plaintiff has failed to
exhaust his administrative remedies.  The Prison Litigation
Reform Act of 1995 declares that "[n]o action shall be brought
with respect to prison conditions under section 1983 of this
title, or any other Federal law, by a prisoner confined in any
jail, prison, or other correctional facility until such
administrative remedies as are available are exhausted."  42
U.S.C. § 1997e(a).  Accordingly, prior to bringing a federal
lawsuit, a prisoner must exhaust the administrative remedies
available through the state.  This requirement has been held to
stand even where the type of relief sought by the prisoner is
not available  through the state administrative process.  *Booth
v. Churner*, 532 U.S. 731 (2001).

At the times relevant to the instant action, the Pennsylvania Department of Corrections (DOC), maintained a three tiered system for reviewing inmate grievances. (Pennsylvania Department of Corrections Consolidated Inmate Grievance Review System, DC-ADM 804, Doc. 73, exhibit 1). To exhaust the formal grievance procedure established by the Pennsylvania Department of Corrections, a prisoner must first file a grievance. If he or she is not satisfied with the result, he or she must then appeal the initial review to the Superintendent, and if he or she is still dissatisfied, he or she must appeal for final review which is conducted by the Central Office Review Committee. *McGrath v. Johnson*, 67 F.Supp.2d 499, 510 (E.D.Pa. 1999).

There are copies of three grievances filed by the plaintiff contained in this summary judgment record. The first grievance is dated December 5, 1999, and is contained in the plaintiff's exhibits to his brief in opposition to the motion for summary judgment. (Doc. 163). The issues raised in that grievance are that the plaintiff was denied his religious

6

AO 72A
(Rev.8/82)

material, the opportunity to shower and exercise and that his cell was hot and poorly ventilated as a result of the plexiglass shield covering the door to his cell. (Doc. 163). There is no evidence that the plaintiff appealed that grievance. A copy of a similar grievance, dated March 17, 2000, was submitted by the defendants. (Doc. 73, exhibit 3). In that grievance the plaintiff complains, inter alia, of the plexiglass shield and the poor ventilation. There is also no evidence that this grievance was appealed. Indeed, the defendants submitted the Declaration of the Grievance Coordinator who stated that the plaintiff did not appeal this grievance. *Id.* Accordingly, the plaintiff has failed to show that he has exhausted his claims relating to his alleged denial of exercise, showers and the plexiglass shield and resulting heat and poor ventilation in his cell and these claims should be dismissed.

The plaintiff has, however, submitted a copy of a grievance dated May 8, 2000, which alleges that he was denied access to his legal and religious material. (Doc. 163). The

7

plaintiff has also submitted evidence showing that he appealed

that grievance to both the Superintendent and the Chief Hearing

Examiner who denied his appeals. *Id.*   Accordingly, these

claims have been exhausted and will be discussed next.


In his affidavit submitted in opposition to the summary

judgment motion, the plaintiff states that he was placed in the

RHU from November 19, 1999, through June 6, 2000, and from July

18, 2000, though October 24, 2000.   (Doc. 163, exhibit F, p.1).

The plaintiff states that at various times while confined in

the RHU he was denied access to his "personal law books." *Id.*

at p.2.   The plaintiff states that: "the denial of my own

personal soft cover law books placed me at extreme risk of

missing a court ordered deadline in one or more of my active

pending state [and] federal civil [and] criminal court cases .

. ."   *Id.* at p.4.


In *Bounds v. Smith*, 430 U.S. 817, 828 (1977), the

Supreme Court held that "the fundamental constitutional right

of access to the courts requires prison authorities to assist

inmates in the preparation and filing of meaningful legal

papers by providing prisoners with adequate law libraries or

adequate assistance from persons trained in the law."    In

*Lewis v. Casey*, 518 U.S. 343 (1996), the Court held that in

order to show that a prisoner's right to access to the courts

was violated, an actual injury must be proven.    The Court

stated:

> Because *Bounds* did not create an abstract,
> freestanding right to a law library or legal
> assistance, an inmate cannot establish relevant
> actual injury simply by establishing that his
> prison's law library or legal assistance program is
> subpar in some theoretical sense.    That would be
> the precise analog of the healthy inmate claiming
> constitutional violation because of the inadequacy
> of the prison infirmary.    Insofar as the right
> vindicated by *Bounds* is concerned, "meaningful
> access to the courts is the touchstone," *id.*, at
> 823, 97 S.Ct., at 1495 (internal quotation marks
> omitted), and the inmate therefore must go one step
> further and demonstrate that the alleged
> shortcomings in the library or legal assistance
> program hindered his efforts to pursue a legal
> claim.    He might show, for example, that a
> complaint he prepared was dismissed for failure to
> satisfy some technical requirement which, because
> of deficiencies in the prison's legal assistance
> facilities, he could not have known.    Or that he
> had suffered arguably actionable harm that he
> wished to bring before the courts, but was so
> stymied by inadequacies of the law library that he
> was unable even to file a complaint. Although
> *Bounds* itself made no mention of an actual-injury

> requirement, it can hardly be thought to have
> eliminated that constitutional prerequisite. And
> actual injury is apparent on the face of almost all
> the opinions in the 35-year line of
> access-to-courts cases on which *Bounds* relied . . .

518 U.S. at 351. Accordingly, "[i]n order to show denial of access to courts, the prisoner must allege that he has suffered an actual injury, such as the loss or rejection of a nonfrivolous legal claim regarding his sentence or conditions of confinement." *Wesley v. Vaughn*, 2001 WL 1391254 (E.D. Pa. Nov. 7, 2001).

In the instant matter, the plaintiff has not demonstrated an actual injury in opposition to the summary judgment motion. He has not demonstrated that he missed a deadline which resulted in the dismissal of an action or that he was otherwise hampered in the prosecution of one of his lawsuits.[2] Since no actual injury has been demonstrated, and since there is accordingly not a showing by the plaintiff that he can prove

---

[2]He does claim, however, that he missed the deadline for filing a brief in a case before this court, *Jay v. Laskey*, 1:CV-99-1610. A review of the docket of that case reveals that the brief was ultimately filed and that the plaintiff suffered no prejudice.

his case, summary judgment for the defendants should be granted as to the claim of a denial of access to courts. *See Celotex, supra*, 477 U.S. at 322.

The plaintiff also claims that he was denied access to his religious material while confined in the RHU in violation of the free exercise clause of the First Amendment.  In his affidavit, the plaintiff states that he was "illegally denied [his] religious material from November 26, 1999, [through] January 30, 2000." (Doc. 163, exhibit F, p.3).  He further states that "the personal religious materials which I was illegally denied during the above referenced time period were/are my Daily Guide Post 2000, my Strong's Exhaustive Concordance of the Bible, my Smith's Bible Dictionary and my Discovery Series Bible Study Booklet."  *Id.* at p.4.  He also states that on April 23, 2000, he suffered a "mental health relapse" and tried to kill himself by swallowing 9 staples. *Id.* at p.7.  As a result, all of his religious and other material was removed from his cell and checked for staples. *Id.*  He states that he did not have his religious material returned to

11

him until May 12, 2000, notwithstanding a medical order stating that he could have his material as of April 28, 2000. *Id.* at pp.8-9.

The defendants note that, pursuant to DC-ADM 801, a prisoner confined in the RHU was permitted to possess one box of legal materials and a "personal bible, Koran or equivalent religious publication." (Doc. 73, Declaration of Ben C. Livingood, p.3). The remainder of the prisoner's property is stored and maintained by the property officer and available on an even exchange basis. *Id.* According to the Inmate Personal Property Inventory, the plaintiff received a Bible on November 23, 1999. (Doc. 73, exhibit 6). According to the property officer's notes, the plaintiff exchanged property on several occasions during his time in the RHU. (Doc. 73, exhibit 7).

In his affidavit the plaintiff states:

Plaintiff avers [and] states that, just because it is indicated on the RHU property officer's notes on my property that on the date listed that legal and/or religious materials (property) was exchanged does "not" necessarily mean that I actually got to go down stairs to the RHU property

12

> room to go through my stored property boxes [and]
> exchange legal and/or religious materials
> (property) [illegible] could also mean and refer
> to the times when the RHU property officer would
> bring me up legal and/or religious materials and I
> would give him some from my cell for those ones
> and/or when something came in through the mail for
> me [and] he brought such up to me.  The only dates
> that I actually went downstairs to the RHU
> property room to go through my boxes of stored
> property [and] exchange legal and/or religious
> materials was on 11-26-99, 1-30-00, 2-13-00,
> March,[illegible], 2000, and on May 25, 2000, all
> the other dates indicated on the property
> officer's notes was when he brought legal and/or
> religious material to my cell to exchange for some
> of the ones in my cell.

(Doc. 163).

By the plaintiff's own admission, he was not totally denied access to his religious material, but rather was inconvenienced in obtaining it and limited in the amount of religious material that he was permitted to have in his RHU cell at one time.  Accordingly, it must be determined whether such limitations constituted a violation of the plaintiff's First Amendment rights.[3]

---

[3]In *Africa v. Pennsylvania*, 662 F.2d 1025 (3rd Cir. 1981), the Court instructed that in addressing a free exercise claim two threshold requirements must first be established, *viz.*, whether the
(continued...)

13

In *DeHart v. Horn*, 227 F.3d 47(3d Cir.2000), the Court of Appeals for the Third Circuit recognized the well established principle that prisoners retain their right to exercise their religion freely.  The Court stated:

> The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof ...." U.S. CONST. amend. I.  In *Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), the Supreme Court held that the First Amendment was incorporated by the Fourteenth Amendment and, thus, applicable to the states. ...[T]he Supreme Court has made clear that "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell v. Wolfish*, 441 U.S. 520, 545, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).  "Inmates clearly retain protections afforded by the First Amendment, ... including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Shabazz*, 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (citations omitted). Nevertheless, the fact of incarceration and the valid penological objectives of deterrence of crime, rehabilitation of prisoners, and institutional security justify limitations on the exercise of constitutional rights by inmates.  *See*

---

[3](...continued)
belief is sincerely held and whether it is religious in nature. It will be assumed for the purpose of the instant motion that plaintiff's allegations are sufficient to satisfy these requirements.

14

> *Pell v. Procunier*, 417 U.S. 817, 822- 23, 94 S.Ct.
> 2800, 41 L.Ed.2d 495 (1974).  Thus, a prison
> inmate "retains [only] those rights that are not
> inconsistent with his status as a prisoner or with
> the legitimate penological objectives of the
> corrections system." *Id.* at 822, 94 S.Ct. 2800.

Id. at 50-51.  The Court then recognized that in *Turner v.*

*Safley*, 482 U.S. 78 (1987), the Supreme Court held that "when a

prison regulation impinges on an inmates' constitutional

rights, the regulation is valid if it is reasonably related to

legitimate penological interests." *Id.* at 51 (*quoting Turner*,

482 U.S. at 89).  The "reasonableness standard" set forth by the

Supreme Court in *Turner* was explained by the Court of Appeals

for the Third Circuit in *Waterman v. Farmer*, 183 F.3d 208 (3rd

Cir. 1999).  There, the Court enumerated four factors that must

be assessed.  "First, there must be a 'valid, rational

connection' between the prison regulation and the legitimate

governmental interest put forward to justify it, and this

connection must not be so remote as to render the policy

arbitrary or irrational." *DeHart, supra*, 227 F.3d at 51

(*quoting Waterman, supra*, 183 F.3d at 213).  The second factor

to be considered is whether there are alterative means for the

15

prisoner to exercise the "circumscribed right." *Id.* Thirdly, the costs of accommodating the prisoner's exercise of his right on the prison must be considered. *Id.* Lastly, it must be considered whether "there are alternatives to the regulation that fully accommodate the prisoner's rights at de minimis cost to valid penological interests." *Id.*

Several courts have applied the above factors to prison regulations which restrict or limit a prisoner's possession of religious material in his cell. In *Friend v. Kolodzieczak*, 923 F.2d 126 (9th Cir. 1991), the Court applied the four *Turner* factors to a prison regulation that barred the possession of rosaries and scapulars in a prisoner's cell and held that the regulation was reasonable and did not violate the free exercise clause of the First Amendment. In *Robinson v. Horn*, 2000 WL 1101351 (E.D. Pa. Aug. 7, 2000), the Court upheld prison regulations preventing practitioners of Native American Spirituality from possessing various religious articles in their cells. Similarly, and directly on point, in *Acosta v. McGrady*, 1999 WL 158471 (E.D. Pa. Mar. 22, 1999), the Court

16

held in considering a summary judgment motion that restricting a prisoner's religious material, including a copy of the Koran, while the prisoner was confined in the RHU does not violate the First Amendment.

Applying the *Turner* factors to the instant matter in light of the above precedent, the defendants' policy of restricting the amount of material allowed to a prisoner confined in the RHU is reasonably related to legitimate penological interests and therefore not unconstitutional. From November, 1999, through April 17, 2000, the plaintiff was permitted to possess one box of legal material and a Bible or equivalent religious publication in his cell.[4]   (Doc. 73, p.3). Under the policy which became effective April 17, 2000, the plaintiff could possess religious and legal material that could be contained in one records center box. *Id.* The plaintiff

_____

[4]The purpose of DC-AMD 801, which imposed the restrictions at issue here, is stated as: "A consistently applied system of sanctions in response to inmate violations of Department of Corrections rules and regulations is established to ensure the safe and orderly operation of institutions and Community Corrections Facilities." (Doc. 73, exhibit 4).

states in his own affidavit that "I actually went downstairs to the RHU property room to go through my boxes of stored property [and] exchange legal and/or religious materials [] on 11-26-99, 1-30-00, 2-13-00, March, [illegible], 2000, and on May 25, 2000." (Doc. 163). He further admits that on other occasions the "RHU property officer would bring me up legal and/or religious materials and I would give him some from my cell." *Id.* Accordingly, it is clear on this summary judgment record that the plaintiff was not completely denied access to his religious material. Indeed, the plaintiff admits that he was allowed a bible and took advantage of the ability to exchange "legal and/or religious materials."[5] Moreover, he also admits that he saw the Protestant chaplain on a few occasions and does not allege that he was in any way otherwise restricted from practicing his religion. As the Court remarked in *Acosta, supra*, "[i]n light of the inherently restrictive environment of the RHU... regulations barring certain personal religious

_____

[5]The plaintiff claims that for a brief period after his attempted suicide his Bible was taken away from him. This deprivation of religious material was reasonable just after the plaintiff had tried to kill himself by swallowing staples that were contained in materials in his possession.

property in the RHU are inherently reasonable where, as here, the prisoner is afforded alternate means of expressing and observing his faith." 1999 WL 158471 at *6. The defendants therefore are entitled to summary judgment in their favor on the plaintiff's free exercise claim.

Finally, the plaintiff also brings various state law claims including claims that the defendants violated the Pennsylvania Constitution. However, "Section 1983 gives no redress for deprivations of state-protected rights." *Gosselin v. McGillen*, 847 F.Supp. 248, 253 (D.R.I 1993). *See also Vargas-Badillo v. Diaz-Torres*, 114 F.3d 3, 6 (1st Cir 1997)("Mere violations of state law do not, of course, create constitutional claims."); *Wickramasinghe v. Village Of Lombard*, 1988 WL 128711 at *4 (N.D.Ill. Nov. 21, 1988)(An alleged violation of state law is an insufficient basis for a Section 1983 claim.").

The plaintiff's state law claims should be dismissed. The court should in its discretion not exercise supplemental

19

jurisdiction over state law claims where not federal cause of action remains.

**IV.    RECOMMENDATIONS.**

Based on the foregoing, it is recommended that the defendants' motion for summary judgment (Doc. 53) be granted in part and that the complaint otherwise be dismissed.  It is recommended that summary judgment be entered in favor of the defendants on the access to the courts claims and free exercise of religion claim.  It is further recommended that all of the plaintiff's other federal claims be dismissed without prejudice based on the plaintiff's failure to exhaust administrative remedies.  Finally, it is recommended that the court decline to exercise supplemental jurisdiction over the plaintiff's state law claims and that those claims be dismissed.

**J. Andrew Smyser**
**Magistrate Judge**

Dated: February _7_, 2002

20

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOHN RICHARD JAE,                :        CIVIL NO. 1:CV-00-0315
                                 :
            Plaintiff            :        (Judge Rambo)
                                 :
            v.                   :        (Magistrate Judge Smyser)
                                 :        **FILED**
                                 :        HARRISBURG, PA
KENNETH K. KYLER, *et al.*,      :
                                 :        FEB 0 6 2002
            Defendants           :
                                          MARY E. D'ANDREA, CLERK
                                 Per _____
                       **NOTICE**            Deputy Clerk

Any party may obtain a review of the Report and Recommendation pursuant to

Rule 72.3 of the Rules of Court, M.D.Pa., which provides:

> Any party may object to a magistrate judge's proposed findings, recommendations
> or report addressing a motion or matter described in 28 U.S.C. §636(b)(1)(B) or
> making a recommendation for the disposition of a prisoner case or a habeas corpus
> petition **within ten (10) days** after being served with a copy thereof. Such party
> shall file with the clerk of court, and serve on the magistrate judge and all parties,
> written objections which shall specifically identify the portions of the proposed
> findings, recommendations or report to which objection is made and the basis for
> such objections. The briefing requirements set forth in Local Rule 72.2 shall
> apply. A judge shall make a de novo determination of those portions of the report
> or specified proposed findings or recommendations to which objection is made and
> may accept, reject, or modify, in whole or in part, the findings or recommendations
> made by the magistrate judge. The judge, however, need conduct a new hearing
> only in his or her discretion or where required by law, and may consider the record
> developed before the magistrate judge, making his or her own determination on the
> basis of that record. The judge may also receive further evidence, recall witnesses
> or recommit the matter to the magistrate judge with instructions.

J. Andrew Smyser
Magistrate Judge

Dated: February 7, 2002.